IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| STEVEN GALES, | No. C 09-05813 CRB |
| Plaintiff, | **ORDER DENYING CLASS CERTIFICATION** |
| v. | |
| WINCO FOODS, | |
| Defendant. | |

Plaintiff Steven Gales moves the Court to certify a class of assistant grocery store managers in this overtime misclassification case. As explained below, the Court concludes that certification is not appropriate because there appears to be significant individual variation in the putative class members' jobs, and because the common sources of proof Plaintiff relies on do not enable the Court to accurately determine how the putative class members actually spend their time. Accordingly, individual questions predominate over common ones, and the requirements of Federal Rule of Civil Procedure 23(b)(3) are not met.

## I.   BACKGROUND

Defendant WinCo Foods, a grocery chain, has stores in several states, including about 30 in California. See Mot. at 1, Opp'n at 1. The stores are open 24 hours a day, seven days a week. Stinger Decl. ¶ 2. Each typically has one store manager and two assistant store managers ("AMs"). Id. WinCo uniformly classifies all of its AMs as exempt from overtime

under the executive exemption. Mot. at N2; Opp'n at 15. Plaintiff alleges that this is a misclassification. See generally Mot. Plaintiff is a former AM at WinCo, where he held the title of Assistant Store Manager and Second Assistant Store Manager on both night and day shifts. Id. at 13.[1] Plaintiff argues that despite being called "managers," "AMs must perform manual labor the bulk of their day" and therefore are entitled to overtime under California law. Mot. at N2.

Plaintiff initially filed suit in state court in September 2009. The case was removed to this Court in December 2009. Plaintiff amended the Complaint in February 2011 and now seeks to certify the following subclasses:

(1) All Assistant Store Managers who worked at WinCo from September 24, 2005, to the present who worked the day and/or swing shift;
(2) All Assistant Store Managers who worked at WinCo from 2008 to the present who worked the night shift (also referred to as the graveyard shift) after WinCo eliminated the Second Assistant Store Manager job title; and
(3) All Second Assistant Store Managers who worked at WinCo from September 24, 2005, to 2008 before WinCo changed the job title to Assistant Store Manager.

Mot. at N1. Plaintiff's proposed subclasses are comprised of 105 AMs who work or worked at WinCo stores in California. Id. at 12.

## II.    LEGAL STANDARD

Plaintiffs bear the burden of proving that certification is appropriate. See Hawkins v. Comparet-Cassani, 251 F.3d 1230, 1238 (9th Cir. 2001). District courts are to rigorously analyze whether the class action allegations meet the requirements of Rule 23. General Tel. Co. of the Sw. v. Falcon, 457 U.S. 147, 161 (1982). "Because the early resolution of the class certification question requires some degree of speculation, however, all that is required is that the Court form a 'reasonable judgment' on each certification requirement. In formulating this judgment, the Court may properly consider both the allegations of the class

---

[1] Apparently, from September 24, 2005 until about June 2008, WinCo referred to Assistant Managers who worked during the day as "Assistant Store Managers," and referred to those who worked at night as "Second Assistant Store Managers." In 2008, WinCo started calling both positions – day and night – simply "Assistant Store Managers," abbreviated here as AMs. Mot. to Amend at 4. In February, the Court allowed Plaintiff to amend the Complaint to reflect these different titles. See dkt. 64. The evidence suggests that, although the stores were different at night (fewer customers, for example), the tasks performed by the AMs at night and during the day were substantially the same.

2

action complaint and the supplemental evidentiary submissions of the parties." In re Citric Acid Antitrust Litig., No. 95-1092, C-95-2963, 1996 WL 655791, *2 (N.D. Cal. Oct. 2, 1996) (citing Blackie v. Barrack, 524 F.2d 891, 900-901 & n.17 (9th Cir. 1975)). Motions for class certification should not become occasions for examining the merits of the case. See Caridad v. Metro-North Commuter R.R., 191 F.3d 283, 293 (2d Cir. 1999).

**III.   DISCUSSION**

Federal Rule of Civil Procedure 23 establishes a two-step procedure for analyzing class certification. First, the following four requirements of Rule 23(a) must be satisfied: (1) numerosity, (2) common questions of law or fact, (3) typicality, and (4) adequate representation. Once those four requirements are met, plaintiffs must show that the lawsuit qualifies for class action status under Rule 23(b). Plaintiff here seeks to certify the class under Rule 23(b)(3). See Mot. at 11. This Order therefore addresses first the requirements of Rule 23(a) and then the requirements of Rule 23(b).

**A.   Rule 23(a) Requirements**

With one exception, WinCo does not really dispute that Plaintiff has satisfied the four Rule 23(a) requirements.

First, the requirement of numerosity is that the class be so numerous that joinder of all members individually would be impracticable. See Fed. R. Civ. P. 23(a)(1); Staton v. Boeing, 327 F.3d 938, 953 (9th Cir. 2003). "Although there is no exact number, some courts have held that numerosity may be presumed when the class comprises forty or more members." See Krzesniak v. Cendant Corp., No. C 05-05156 MEJ, 2007 WL 1795703, at *7 (N.D. Cal. June 20, 2007). Here, the proposed class is 105 members, and so Plaintiff meets this requirement. See Mot. at 12.

Second, the requirement of commonality demands that there be "questions of law or fact common to the class." Fed. R. Civ. P. 23(a)(2). The requirements for showing commonality are "minimal." See Hanlon v. Chrysler Corp., 150 F.3d 1011, 1020 (9th Cir. 1998). The showing required for Rule 23(a)(2) is "less rigorous" than the related requirements of Rule 23(b)(3) (discussed below). See id. at 1019-20. "The existence of

3

shared legal issues with divergent factual predicates is sufficient, as is a common core of salient facts coupled with disparate legal remedies within the class." Id. at 1019. Notably, despite the "permissive[]" standard, id., commonality was a hurdle the plaintiffs in the recent Wal-Mart Stores, Inc. v. Dukes, 564 U.S. —, 131 S.Ct. 2541, 2011 WL 2437013, at *11 (2011) could not clear. The Court explained in that case:

> We quite agree that for the purposes of Rule 23(a)(2) "even a single [common] question" will do. . . . We consider dissimilarities not in order to determine (as Rule 23(b)(3) requires) whether common questions predominate, but in order to determine (as Rule 23(a)(2) requires) whether there is "[e]ven a single [common] question." And there is not here. Because respondents provide no convincing proof of a companywide discriminatory pay and promotion policy, we have concluded that they have not established the existence of any common question.

Id. at *11 (internal quotation marks omitted).

Here, in contrast, Plaintiff identifies and objects to a single policy that affects all would-be class members: WinCo's policy of classifying all AMs as exempt. This theory of the case presents several common questions, such as whether WinCo's classification was correct, whether it was done knowingly, whether all class members share similar job duties, and the proper categorization of those duties as exempt or not-exempt. See Krzesniak, 2007 WL 1795703, at *7 (noting that "[j]udges from this district – in recent exempt/non-exempt classification cases involving store manager claims under California law for unpaid overtime and mean [sic] and rest period violations – have found sufficient commonality when" such issues were presented). Plaintiff therefore meets this requirement.

Third, the requirement of typicality is met if "the claims or defenses of the representative parties are typical of the claims or defenses of the class." Fed. R. Civ. P. 23(a)(3). Representative claims need only be "reasonably co-extensive with those of absent class members; they need not be substantially identical." See Hanlon, 150 F.3d at 1020. Here, Plaintiff's claims arise from the same remedial or legal theories as those of the proposed class: all are subject to the same classification policy. See Arnold v. United Artists Theatre Circuit, Inc., 158 F.R.D. 439, 449 (N.D. Cal. 1994). WinCo contends, though, that Plaintiff's claim that he was misclassified "may be similar to the other ten former WinCo AMs who signed declarations in support of class certification, but it is completely at odds

4

1   with the other 36 AMs who submitted declarations in opposition to class certification and
2   testified they spent most of their time performing management duties." Opp'n at 25. But
3   that is a predominance argument; it is another way of arguing that individual issues defeat
4   common ones. That is not the concern of Rule 23(a)(3). See Tierno v. Rite Aid Corp., No. C
5   05-02520 TEH, 2006 WL 2535056, at *2 (N.D. Cal. Aug. 31, 2006) (holding that argument
6   that plaintiff was not typical because other class members spent less than 50% of their time
7   on non-exempt tasks . . . is not an appropriate basis for challenging Plaintiff's typicality").
8   Plaintiff therefore meets this requirement.

9         Fourth, the requirement of adequate representation asks whether the representative
10  "will fairly and adequately protect the interests of the class." See Fed. R. Civ. P. 23(a)(4).
11  Courts are to inquire (1) whether the named plaintiffs and counsel have any conflicts of
12  interest with the rest of the class and (2) whether the named plaintiff and counsel will
13  prosecute the action vigorously for the class. See Hanlon, 150 F.3d at 1020. Nothing
14  suggests that Plaintiff has a conflict with the class. Plaintiff worked both day and night
15  shifts; although he is not a current employee and some class members are, WinCo does not
16  suggest that this will present a conflict, and indeed, Plaintiff's former employee status could
17  benefit the class. See 1 Newberg on Class Actions § 3:35 (4th ed.) ("Far from being
18  inadequate class representatives, plaintiffs whose relationships with the defendant have been
19  terminated may be more forceful advocates because they will be free from pressure and
20  reprisals by the defendant."). Moreover, nothing suggests that Plaintiff or his counsel will
21  not prosecute the action vigorously. Plaintiff has apparently "actively participate[d] in
22  discovery." Mot. at 13 (citing Workman Decl. ¶ 48). And Plaintiff's counsel is experienced
23  in class action lawsuits arising from wage and hour violations. Id. The Court is not
24  concerned that the case will not be vigorously prosecuted. Plaintiff meets this requirement as
25  well.

26      **B.**    **Rule 23(b)(3) Requirements**

27        Having satisfied the elements of Rule 23(a), a plaintiff must next demonstrate that the
28  action can be appropriately certified under Rules 23(b)(1), (b)(2), or (b)(3). Plaintiff here

seeks to certify the class under Rule 23(b)(3). See Mot. at 11. To do so, Plaintiff must establish that "the questions of law or fact common to the members of the class predominate over any questions affecting only individual members, and that a class action is superior to other available methods for the fair and efficient adjudication of the controversy." See Fed. R. Civ. P. 23(b)(3). This Order addresses first the issue of predominance and then the issue of superiority, concluding that Plaintiff falls short as to both.

### 1. Predominance

Mere commonality pursuant to Rule 23(a)(2) is insufficient to meet Rule 23(b)(3)'s predominance requirement. See Hanlon, 150 F.3d at 1022. Rule 23(b)(3) instead concerns "the relationship between the common and individual issues. 'When common questions present a significant aspect of the case and they can be resolved for all members of the class in a single adjudication, there is clear justification for handling the dispute on a representative rather than an individual basis.'" Id. (citing Alan Wright, Arthur R. Miller & Mary Kay Kane, Federal Practice & Procedure § 1778 (2d ed. 1986)). "Because no precise test can determine whether common issues predominate, the Court must pragmatically assess the entire action and the issues involved." Romero v. Producers Dairy Foods, Inc., 235 F.R.D. 474, 489 (E.D. Cal. 2006). "Common questions may predominate where the resolution of a question common to the class would significantly advance the litigation." Id.

#### a. Evidence of Commonality

Here, Plaintiff argues that common questions predominate because WinCo's centralized policies and the control it exercises over its stores result in all AMs performing substantially the same duties. See generally Mot. In support of this argument, Plaintiff relies on the following evidence.

Plaintiff presents evidence that all AMs are assigned to the store's Grocery Department, id. at 4, and that a single Job Description summarizes their responsibilities in all stores, Workman Decl. Ex. 20; Workman Decl. Ex. 8, Response to Inspection Demands Nos.

6

56 & 57.[2] According to WinCo's Job Description, AMs are to assist the store manager in "planning, coordinating and managing the store operations so as to control costs, meet targeted labor, maintain projected profit margins, meet or exceed sales goals, provide a pleasant and safe shopping experience for customers and a safe professional working environment for employees." Supp. Workman Decl. Ex. 16. The Job Description lists, among other things, the following responsibilities:

- . . . comply with WinCo Foods Company Policies . . .
- Monitor[] the hour to hour store appearance and conditions to ensure high standards of cleanliness, efficiency and productivity.
- Evaluate[] and implement[] store merchandising plans.
- Monitor[] employee effectiveness and productivity and ensures efficient labor utilization in the grocery department.
- Perform[] Store personnel functions as necessary
- Perform[] delegated Store Manager responsibilities . . .

Id. The Job Description states that AMs must have the ability to "provide leadership," "lift and maneuver objects" of up to 50 pounds, "operate checkstand equipment such as scales, scanners, and cash registers," "stand, walk and move rapidly for long periods of time," "band, stoop, twist and turn frequently," and "perform basic math." Id. It further requires that AMs be able to operate a pallet jack, forklift, garbage compactors and office machines like computers. Id. It does not state how much time AMs should spend on any individual task.

Plaintiff also points to a Job Analysis that WinCo created for AMs. WinCo's Human Resources Director, and Federal Rule of Civil Procedure 30(b)(6) witness, testified that WinCo provides the Job Analyses for all WinCo positions so that employees can understand WinCo's expectations. Stinger Dep. 91:5-92:7, 104:13-105:6, 105:25-106:5.[3] That

---

[2] The differences between the documents pertaining to Second Assistant Store Managers and AMs are slight.

[3] As the Court stated at the motion hearing, it sides with Plaintiff on the evidentiary dispute over the AM Job Analysis. In connection with its Opposition, WinCo submitted the declaration of Ray Sagarik, WinCo's Manager of Risk Management Department. Sagarik discounts the importance of the AM Job Analyses, stating "The purpose of the job description is to state what the position does and is responsible for. The job analysis, on the other hand, does not describe duties and responsibilities. It sets forth the physical requirements that may be required of the position. . . . [it] is not intended to convey regular physical requirements of the job on a daily basis, but rather what the job at the most may require from time to time." Sagarik Decl. ¶ 3.

7

document instructs the person creating it to "[p]lease check the box for each of the tasks the worker will do on this job." See Workman Decl. Ex. 17 (emphasis added). There are three categories of tasks: Body Movements, Endurance, and Physical. Id. AMs, when they were called Second Assistant Store Managers, were expected to lift 1-49 pounds for 6-8 hours a day per 8 hour day. Id. They were expected to stand for 3-6 hours a day per 8 hour day. Id. And they were only expected to sit for 0-1 hours per day. Id. The same requirements are reflected in the AM Job Analysis of December 2008. See Supp. Workman Decl. Ex. 1, Gilchrist Depo. Ex. 3.[4] The Job Analysis does not provide any additional detail as to what tasks AMs will be performing while standing, lifting, etc.

Plaintiff additionally presents evidence that WinCo requires all AMs to participate in the same training program. See Stinger Depo. at 32:3-40:25 (describing Leadership

---

Plaintiff objects to Sagarik's Declaration, arguing that it served a Rule 30(b)(6) notice on WinCo, asking WinCo to produce the person most knowledgeable on the topic of "the duties of Assistant Store Managers in California Between September 24, 2005, and the present." Reply at 6 (citing Workman Decl. Ex 9 at 2 category 7). WinCo produced Karen Stinger, its Director of Human Resources. Reply at 6 (citing Stinger Depo. at 5:15-16). Further, Stinger testified about the Job Description and Job Analysis, explaining that they are "one and the same." Stinger Depo at 101:15-102:7. She further testified that the point of WinCo Job Analyses is to "explain what typically and generally is expected physically, what's required to do the job so that an individual knows what they're applying to do and what would be expected of them." Stinger Depo at 92:4-7. Plaintiff argues that it relied on Stinger's testimony and that, because Sagarik was never disclosed as part of its Rule 26 disclosures, or in response to Plaintiff's 30(b)(6) notice, the Court should not consider his declaration.

WinCo responds that under Rule 26(e), it was only required to supplement its initial disclosures if the disclosure or responses were incomplete or incorrect and if the additional or corrective information had not otherwise been made known. It argues that Stinger made Sagarik's identity known during her deposition, Stinger Depo. at 28:16-31:1, and that Plaintiff's decision not to depose Sagarik was his own.

While it is true that Stinger identified Sagarik in her deposition as the author of the job descriptions, see Stinger Depo. at 29:9-18, Plaintiff is entitled to rely on the testimony of WinCo's 30(b)(6) witness as to the job duties of the AMs, which she testified were contained within the Job Description and the Job Analysis. As a 30(b)(6) witness, her testimony is a sworn corporate admission binding on the corporation. See Murphy v. Kmart Corp., 255 F.R.D. 497, 506 (D.S.D. 2009). Moreover, Sagarik's assertion that the Job Analysis is intended to convey "what the job at the most may require from time to time," Sagarik Decl. ¶ 3 (emphasis in original), is at odds with the document's instruction to the preparer to check the box "for each of the tasks the worker will do on the job." See, e.g.. Workman Decl. Ex. 17 (emphasis added). The Court therefore GRANTS Plaintiff's objection to the Sagarik Declaration and relies on Stinger's deposition testimony about the Job Analyses.

[4] The Job Analysis for AMs that was produced earlier, see Reply at Summary-2 (discussing production issues), has different boxes checked off for hours in an 8 hour day: AMs were expected to lift 1-19 pounds for 1-3 hours per day, carry 1-19 pounds for 1-3 hours in an 8 hour day, and were only expected to sit for 0-1 hours in an 8 hour day. See Workman Decl. Ex.19.

8

1 Development Program, and MIT program that preceded it); Collier Depo. at 81:12-20.
2 Plaintiff provides very little detail about what the training entails.[5]

3   Further, Plaintiff presents some evidence of centralized control in WinCo stores.
4 WinCo has a Space Management Department that creates store layouts and schematics.
5 See Ashworth Depo. at 9:15-10:20. The schematics allocate facing for some, but not all,
6 products,[6] meaning that they set out the exact number of those products to place on the
7 shelves, as well as the precise placement of the shelves. Id. at 32:14-36:1. WinCo also has a
8 New Item Committee that meets monthly to determine what new items to bring into WinCo
9 stores. Id. at 51:6-12. It has a VP of Procurement, who negotiates the cost of products sold at
10 Winco. See Kintz Depo. 33:19-23; 35:17-2437:9-13. And it has a VP of Merchandising and
11 Retail Pricing, who negotiates deals regarding cost, promotions and new items with direct
12 store delivery vendors, and decides what products go in a new store. Id. at 54:11-55:20;
13 85:23-86:7.

14   Plaintiff points, too, to evidence that WinCo assigns target labor hours for each task
15 performed by the hourly employees (that is, the employees supervised by the AMs) in
16 WinCo stores, which are used to generate target hours "to see how well [a] store performed
17 in a given department" each week. Olds Depo. at 17:9-18:23; Workman Decl. Ex. 37 at 3.
18 The time values apply uniformly to all WinCo stores. Olds Depo. at 14:1-3. AMs are to
19 manage their supervisees so that the store meets its target hours, and are trained on the target

---

[5] WinCo argues through the declaration of Karen Stinger that the Leadership Development Program "sets forth WinCo's expectations of managers – that they should be primarily managing store operations and not simply performing manual labor." Stringer Decl. ¶ 10. (Plaintiff objects to this evidence, arguing lack of personal knowledge, but, as HR director, Stinger should have personal knowledge of the employees' training.) This is largely an argument about the merits of the dispute – whether AMs manage or not. Participation by every AM in the same training program provides some support for an inference of commonality, even if (as WinCo argues) it turns out that the contents of the training program also support an inference that the position is exempt. See Moore v. Hughes Helicoptors, Inc., 708 F.2d 475, 480 (9th Cir. 1983) ("improper to advance a decision on the merits to the class certification stage").

[6] Schematics generally govern the placement of name brand, bulk items, but do not determine where or how all products are merchandized. See Opp'n at 11 (citing Wille Decl. ¶ 12 ("although store management might use schematics for some items, the managers at the store level have discretion to deviate from the schematics and to determine the best way to merchandize display items"), Croston Decl. ¶ 18, Horton Decl. ¶ 6, Lee Decl. ¶ 13, Lujan Decl. ¶ 13, Thompson Decl. ¶¶ 11-12, Vazquez Decl. ¶ 19).

9

1  hours.  Id. at 28:3-22; Workman Decl. Ex. 35, 37.  AMs cannot set or change the number of
2  labor hours allocated to their store.  See Wille Depo. 83:13-20.

3  And Plaintiff relies on the declarations of eleven putative class members, which
4  describe the job of AM in similar terms and as one involving hands-on work.[7]  See, e.g.,
5  Garcia Decl. ¶ 7 ("I spent almost all of my time doing manual labor") and ¶ 8 ("Like when I
6  worked the night shift, when I worked the day shift, I stocked shelves, faced shelves,
7  received deliveries and kept the store and the parking lot clean."); Smith Decl. ¶ 7 ("I
8  unloaded trucks, moved the product to the aisles, unpacked the product from the cardboard
9  boxes, stocked the shelves, faced the aisles, cashiered, placed orders to replenish the stores,
10 put up and took down displays pursuant to merchandising plans, picked up cardboard,
11 retrieved shopping carts, and cleaned the store"); Williams Decl. ¶ 8 ("I was on the floor
12 lifting, carrying, and pushing and pulling product from place to place approximately 8 hours
13 a day.  I spent little, if any, time doing office work."); Sumner Decl. ¶ 5 ("I rarely spent any
14 time doing office work.").

15 Finally, Plaintiff cites WinCo's uniform classification of AMs as exempt – the policy
16 decision central to this case – as evidence that WinCo thinks that the job of an AM is
17 uniform.  Mot. at 4.

### b.    Individual Questions Predominate

19 Despite all of that evidence, Plaintiff's case for certification fails for two reasons.
20 First, there is significant evidence of variation in AMs' jobs.  Second, although Plaintiff's
21 evidence illustrates with some detail what WinCo stores are like, and, to a lesser extent, what
22 kinds of things AMs do, it does not answer the central question in this case: whether AMs
23 spend the majority of their time performing exempt duties.

### i.    The Evidence of Individual Variation

25 WinCo's best evidence of individual variation in the AMs' jobs is the thirty-six
26 declarations it submitted of putative class members, representing more than three times the

---

[7] Plaintiff, like WinCo, frequently focuses on the merits rather than certification.  Most of Plaintiff's declarations seem aimed at supporting the argument that AMs performed a majority of non-exempt work, not that they all did the same thing.

10

number of declarations submitted by Plaintiff and over one-third of the putative class. The declarations assert not only that AMs perform managerial functions,[8] but that their tasks vary based on whether the shift takes place during day (when AMs supervise between 50 and 180 employees) or night (when AMs supervise between 15 and 50 employees),[9] and based on "different community demographics, different management teams, different numbers and types of hourly employees, different customer preferences and buying patterns, and different levels of experience among employees and management." Wille Decl. ¶ 6.[10]

Thus, WinCo argues convincingly that "the amount of time AMs spend on personnel management varies significantly depending on employee turnover, employee experience, the economy, the Store Manager's style, the AM's experience, and many other factors,"[11] that "the amount of time AMs spend on managing employee efficiency varies from AM to AM, store to store, week to week, and shift to shift based on a variety of factors,"[12] that "the amount of time AMs spend on making decisions related to ordering varies from AM to AM, store to store, week to week, and shift to shift based on a variety of factors,"[13] that "the amount of time spent on merchandising 'varies from week to week and can fluctuate

---

[8] See, e.g., Wille Decl. ¶ ("[A]n Assistant Manager has to always be managing, monitoring employee performance, evaluating the needs of the store, and coaching, training, and mentoring employees to improve efficiency and store profitability . . . To that end, I set expectations and delegated tasks, communicated assignments and expectations to the employees, followed up and managed these expectations, and constantly monitored and evaluated the condition of the store, product inventory, merchandising, and employee efficiency to make the store more profitable. Based on my experience, if you do not do these things as an [AM] at WinCo, you are not managing as the company expects you to manage.")

[9] See Summary No. 2 at 2. The Court notes that although Plaintiff has objected to this Summary, Federal Rule of Evidence 1006 permits summaries of lengthy evidence.

[10] WinCo's declarants also assert that "store needs changed seasonally depending on the holidays," id., but this last point is relatively weak: the holiday season not only occurs in every AM's store; it does so simultaneously.

[11] Opp'n at 7 (citing Summary No. 9 at 12; Vazquez Decl ¶ 14 (time varies) and Bailey Decl. ¶¶ 4, 8 (more time spent on personnel matters in Roseville because there are more employees and discipline is "more involved")).

[12] Opp'n at 9 (citing Summary No. 15 at 20; Head Decl. ¶ 9 (spends more time at night).

[13] Opp'n at 10 (citing Summary No. 17 at 24).

11

1  significantly in different times of the year" and varies store to store,[14] that "the amount of
2  time AMs spend negotiating with vendors also varies based on the Store Manager's approach
3  to dealing with vendors and the AM's experience,"[15] and that "the amount of time AMs
4  spend performing the same work as hourly subordinates, and the extent to which this work is
5  done for the purpose of managing, training, coaching and team building, varies significantly
6  from AM to AM, store to store, and shift to shift based on a variety of factors."[16]

   Defendants that have demonstrated variation in the time spent on particular tasks have often succeeded in defeating class certification. See, e.g., Weigele v. FedEx Ground Package Sys., Inc., 267 F.R.D. 614, 622 (S.D. Cal. 2010) (denying class certification where "the amount of time any particular manager spent in any particular area varies greatly"); Jimenez v. Domino's Pizza, Inc., 238 F.R.D. 241, 251 (C.D. Cal. 2006) (denying class certification where "the question presented . . . is not whether the tasks performed are exempt but rather how much time is spent on each task, which is necessarily an individualized inquiry"); see also Kurihara v. Best Buy Co., Inc., No. C 06-01884 MHP, 2007 WL 2501698, at *10 (N.D. Cal. Aug. 30, 2007) (concluding that "courts are comfortable with individualized inquiries as to damages, but are decidedly less willing to certify classes where individualized inquiries are necessary to determine liability").

   The Court recognizes that "the relevant issue is whether Store Managers spend more than 50 percent of their time on managerial duties – not whether each store manager spends the exact same amount of time on each" task. See Tierno, 2006 WL 2535056, at *8. That an AM spends less time supervising an experienced subordinate,[17] or more time hiring during the holiday season, should not alone defeat class treatment. And of course,

---

[14] Opp'n at 12 (citing Summary No. 19 at 27; Croston Decl. ¶ 19; Weisman Decl. ¶ 17 (spent more time on merchandising displays at the Eureka store due to higher sales volume).

[15] Opp'n at 12 (citing Summary No. 21 at 29).

[16] Opp'n at 13-14 (citing Summary Nos. 5-7).

[17] Incidentally, Plaintiff disputes that this is the case, noting that "WinCo does not allocate any additional time to perform the tasks for 'inexperienced' employees," but expects all employees to perform each task in the same amount of time. See Reply at 15.

12

> [i]f one zooms in close enough on anything, differences will abound; even for a single employee doing a single job, the amount of time that she spends donning and doffing on Monday will differ, at least minutely, from the amount of time that she spends donning and doffing on Tuesday. But plaintiffs' claims need to be considered at a higher level of abstraction.

Frank v. Gold'n Plump Poultry, No. 04-CV-1018 (PJS/RLE), 2007 WL 2780504, at *4 (D. Minn. Sept. 24, 2007). However, even considered at a higher level of abstraction, WinCo's declarations demonstrate considerable variation between the class members: for example, Plaintiff's declarants attest to having spent "almost all of their time" performing manual labor, see, e.g., Gales Decl. ¶ 11, while WinCo's declarants attest to spending between 50 and 100 percent of their time on managerial duties, see, e.g., Alvarez Decl. ¶ 8, T. Anderson Decl. ¶ 13.[18]

### ii. The Common Sources of Proof Are Inadequate

Notably, this case involves both (1) whether certain AM tasks should be characterized as exempt or non-exempt and (2) whether AMs spend more time doing exempt tasks than non-exempt tasks. See Jimenez, 238 F.R.D. at 251. The first question is likely susceptible to common sources of proof. Thus, Plaintiff argues that because ordering is done not only by AMs but by WinCo's hourly employees, it is not exempt work, Reply at 18 (citing Supp. Workman Decl. Ex. 1, Gilchrist Depo. Ex.1), while WinCo argues that ordering is an exempt task because there are three different ways to order, involving varying degrees of sophistication and discretion, Opp'n at 9-10. Similarly, Plaintiff argues that "merchandising" is non-exempt, consisting solely of setting up cardboard displays pursuant to a schematic, Reply at 18 (citing, e.g., Gilchrist Depo 114:5-12 (defining items being merchandised as displays being "straight and neat")), while WinCo disagrees, maintaining that merchandizing plans only dictate the placement of products in store aisles, and that AMs "have significant discretion in determining what products to display on the Wall of Values and other display

---

[18] A further question raised by the competing declarations is whether doing manual labor as a way to train employees or boost morale – two of the explanations frequently offered up by WinCo's declarants – constitutes exempt or non-exempt work. See, e.g., Wille Decl. ¶ 11 ("I may have chosen from time to time to jump in periodically with the crew to throw freight in order to boost morale or to evaluate their performance. But even when I performed manual labor alongside the crew, it was for the purpose of managing and mentoring. I was still managing one hundred percent of the time.").

13

space throughout the store," Opp'n at 11, argument of Defendant's counsel at motion hearing. Analysis of WinCo executives' testimony and of WinCo's policies and training materials should make plain whether ordering, merchandizing, and related tasks are truly managerial. See, e.g., Campanelli v. The Hershey Co., No. C 08-1862, 2010 U.S. Dist. LEXIS 92364, at *11 (N.D. Cal. Aug. 13, 2010) ("Based on the declarations filed by both sides, merchandising includes activities such as stocking shelves, sorting product, building displays, and tagging Hershey product. Whether these activities constitute selling, as Hershey contends, or constitute the sort of promotional activities which do not constitute selling, appears capable of decision on a collective basis."). However, in the Court's view, the second question, whether AMs spend more time doing exempt tasks than non-exempt tasks, is not susceptible to Plaintiff's common sources of proof.

California law requires courts assessing overtime exemptions to examine the work actually performed by the employees at issue. See Ramirez v. Yosemite Water Co., Inc., 20 Cal. 4th 785, 802 (1995) ("courts should consider, first and foremost, how the employee actually spends his or her time" before considering the employer's realistic expectations, any expressions of employer displeasure, and whether such expressions were realistic); see also Sav-On Drug Stores, Inc. v. Superior Court, 34 Cal. 4th 319, 336-37 (2004) (noting that "[a]ny dispute over 'how the employee actually spends his or her time' of course, has the potential to generate individual issues" but adding that "'the employer's realistic expectations' and 'the actual overall requirements of the job' are likely to prove susceptible of common proof.").

The Central District of California applied Ramirez in Sepulveda v. Wal-Mart Stores, Inc., 237 F.R.D. 229 (C.D. Cal. 2006) (affirmed in relevant part, 275 Fed. Appx. 672, 2008 WL 1868333, at *1 (9th Cir. 2008)), a case involving allegations that Wal-Mart misclassified its AMs. The court explained that "[t]he proper question . . . at this stage . . . is whether [an individualized Ramirez-type] inquiry is the predominant issue." Id. at 247. The evidence in that case included centralized decision-making by Wal-Mart as to display arrangements, prices, and the physical environment of the stores, as well as a uniform training program and

1  a distinct set of job duties. Id. at 237-40. Nonetheless, the court found that "many highly
2  individualized questions remain. . . . most important[ly] . . . whether each individual AM
3  actually spent more time working on exempt or non-exempt duties." Id. at 247. The court
4  found fault with Plaintiff's representative evidence, and found that there was a variation in
5  AM duties. Id. at 248-49. Concluding that "[b]y far the bulk of the evidence would pertain
6  to individualized questions, including the work performed by each individual AM," the court
7  denied class certification. Id. at 249. Although Sepulveda allowed that "[o]ther cases may
8  involve far more standardized work policies, more clearly non-exempt duties, and a smaller
9  number of variable factors, rendering them susceptible to the type of collective proof that
10 Plaintiffs offer here," id. at 249, this is not such a case.[19]

11        "Plaintiff's theory of this case is that he can establish through common proof, i.e.,
12 WinCo's documents, standardized hierarchy, uniform training, uniform policies and
13 procedures, and the testimony of its corporate executives, the work performed by AMs on a
14 collective basis and that more than 50% of the work is non-exempt." Reply at Summary-3.
15 Plaintiff's counsel affirmed at the motion hearing her intention to try this case without a
16 single AM testifying. See argument of Plaintiff's counsel at motion hearing. When
17 evaluating a motion for class certification, a plaintiff's theory is the guide. See United Steel,
18 Paper & Forestry, et al. v. ConocoPhilips Co., 593 F.3d 802, 808 (9th Cir. 2010) (district
19 court abused discretion by treating plaintiff's theory as "all but beside the point"). Plaintiff
20 contends that his theory is consistent with both In re Wells Fargo Home Mortgage Overtime
21 Pay Litigation, 571 F.3d 953 (9th Cir. 2009) and Vinole v. Countrywide Home Loans, 571
22 F.3d 935, 947 (9th Cir. 2009). Reply at 2. Indeed, the court in Wells Fargo, 571 F.3d at 958,
23 explained that "uniform corporate policies will often bear heavily on questions of
24 predominance and superiority. Indeed, courts have long found that comprehensive uniform

---

[19] The Court recognizes that Sepulveda involved 2,750 potential class members in over 160 California stores, id. at 236, 242, and that here, the putative class has 105 members spread between 29 or 30 stores, see Mot. at 1, 12; Opp'n at 1; see also Kresniak, 2007 WL 1795703, at *16 (distinguishing Sepulveda from case involving 76 members and 36 locations). While this numerical difference makes the putative class in this case more manageable than that in Sepulveda, it is not dispositive on the issue of predominance.

15

1  policies detailing the job duties and responsibilities of employees carry great weight for
2  certification purposes." Id. at 958 (emphasis added).  Similarly, the court in Vinole, 571 F.3d
3  at 946, directed courts to focus "on whether the employer exercised some level of centralized
4  control in the form of standardized hierarchy, standardized corporate policies and procedures
5  governing employees, uniform training programs, and other factors susceptible to common
6  proof."

   As discussed above, Plaintiff relies largely on the AM Job Description, Job Analysis, centralized training, centralized policies limiting some of the control AMs have over their stores, the target labor hours that they must manage towards, and WinCo's uniform classification of AMs as exempt.  Although that evidence gives the Court a general sense of the AM job (as involving hiring, supervising and disciplining hourly employees, ordering, merchandising, lifting things, and standing for long periods of time), it does not tell the Court with the requisite specificity how AMs actually spend their time.  See Weigele, 267 F.R.D. at 622 (internal citation omitted) ("Defendant's common processes and training are not overwhelmingly supportive of a finding that common issues predominate.  For example, the training materials . . . provide no help to the Court in determining the actual work mix performed by the Plaintiffs.  The common processes are similar, speaking to the small details of particular tasks but not how managers were to balance their responsibilities.").

   Similarly, in Marlo v. United Parcel Service, 639 F.3d 942, 948 (9th Cir. 2011), another misclassification case, the Ninth Circuit rejected a plaintiff's contention that he had satisfied his burden of demonstrating predominance by identifying "evidence of UPS's centralized control, and uniform policies and procedures."  The court explained, "the fact that UPS expects [its full-time supervisors] to follow certain procedures or perform certain tasks does not establish whether they actually are 'primarily engaged' in exempt activities during the course of the workweek . . . or whether they 'customarily and regularly exercise [] discretion and independent judgment." Id.  The court found that decertification was appropriate. Id. at 949.

Even more recently, Judge Conti of this district decertified a misclassification class once he determined that payroll certification forms initially relied on as common proof of misclassification were not reliable, and that the remaining evidence – representative testimony, centralized operational and human resources hierarchy, uniform training, uniform on-the-job tools, daily planners that require the putative class members to perform certain tasks, and corporate policies intended to standardize their experiences – was inadequate. See Cruz v. Dollar Tree Stores, Inc., Nos. 07-2050 SC, 07-4012 SC, 2011 WL 2682967, at *6-*8 (N.D. Cal. Jul. 8, 2011). The Court explained, "While this evidence does provide some proof that class members shared a number of common employment experiences, it does not provide common proof of whether they were spending more than fifty percent of their time performing exempt tasks." Id. at *8.

As in Marlo and Cruz, the Court concludes that the common proof offered by Plaintiff does not establish whether WinCo's AMs actually spend their time performing primarily exempt or primarily non-exempt tasks. Evidence of the existence of a New Item Committee illustrates only something that AMs do not do. Evidence that AMs rarely sit down is not evidence of what tasks they are performing while upright. Evidence of target hours worked by the hourly employees the AMs supervise fails to reveal what the AMs are doing during those same hours. Determining "how the employee actually spends his or her time" would therefore require many individualized inquiries. Accordingly, common questions do not predominate over individualized ones in this case.

### 2. Superiority

Finally, in addition to demonstrating the predominance of common questions, a plaintiff seeking to certify a class under Rule 23(b)(3) must demonstrate "that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy." Pertinent to that determination is: (a) the class members' interests in individually controlling the prosecution or defense of separate actions; (b) the extent and nature of any litigation concerning the controversy already begun by or against class members; © the desirability or

1  undesirability of concentrating the litigation of the claims in the particular forum; and (d) the
2  likely difficulties in managing a class action.  Fed. R. Civ. P. 23(b)(3).
3       WinCo does not argue that individual putative class members have any interest in
4  individually controlling their cases, and the parties' arguments at the motion hearing allayed
5  the Court's concerns about the separate complaints filed against WinCo by three putative
6  class members.  Nor does the Court find that concentrating the claims in this forum would be
7  problematic.  However, in light of the Court's conclusion as to predominance – namely, that
8  trying the case as a class would involve many individualized inquiries about what AMs
9  actually do or did in the performance of their jobs – the Court finds that a class action would
10 be impractical and unmanageable.  See Haley v. Medtronic, Inc. 169 F.R.D. 643, 651-52
11 (C.D. Cal. 1996) ("even if seventy-five percent of the issues are common questions –
12 assuming seventy-five percent is enough to establish "predominance" – if the other
13 twenty-five percent that are individual in nature are significant enough, class action treatment
14 might not be 'superior' after all."); Weigele, 267 F.R.D. at 625 (conceding that "denying
15 certification eliminates some efficiencies of class treatment" such as taking depositions of
16 company executives, retaining experts, and compelling discovery of company policies and
17 procedures, but concluding that "the substantial difficulties" involved in calling a large
18 number of testifying class members "make class treatment inferior").  Accordingly, the Court
19 concludes that a class action is not superior to other methods for resolving the parties'
20 dispute.

21 **IV.    CONCLUSION**

22      For the foregoing reasons, the Court finds that certification under Rule 23(b)(3) is not
23 warranted, and DENIES the Motion to Certify the class.

24      **IT IS SO ORDERED.**

25

26 Dated: August 26, 2011                         CHARLES R. BREYER
                                                  UNITED STATES DISTRICT JUDGE
27

28